

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

IN THE MATTER OF THE EXTRADITION OF
MUHAMMAD FAROOQ TAWAKKAL,
a/k/a "Muhammad Farooq Qadir,"
a/k/a "Muhammad Farooq Abdul Qadir,"
a/k/a "Farooq Abdul Qadir,"          Criminal No. 3:08mj118
a/k/a "Farooque Qadir,"
a/k/a "Farooque Tawakkal,"
and
MUHAMMAD FARID TAWAKAL,
a/k/a "Muhammad Farid Qadir,"
a/k/a "Farid Qadir Tawakkal,"
a/k/a "Farid Abdul Qadir."

## MEMORANDUM OPINION

The United States, acting on behalf of the Government of the Islamic Republic of

Pakistan (collectively the "Government"), seeks a certification that Muhammad Farooq

Tawakkal and Muhammad Farid Tawakal[1] (the "Qadirs") are extraditable to Pakistan. The

Government proceeds under the Extradition Treaty Between the United States of America and

the United Kingdom of Great Britain and Northern Ireland of December 22, 1931 (47 Stat.

122, TS 849, 12 Bevans 482, 163 LNTS 59) (the "Treaty"), continued in force between the

---

[1] Some documents in this case, including the Complaint as indicated by the style of the case, alternate spelling of the family's name between "Tawakkal" and "Tawakal." Because the documents from Pakistan more frequently use the latter, so will this Court.

Also, Farooq and Farid Tawakal used the surname "Qadir"when in the United States, and each has a separate case in the Eastern District of Virginia under the name "Qadir." Pakistan seeks extradition under the family's surname of "Tawakal" alleging misconduct associated with the family's businesses kept under the aegis of the "Tawakal Group." The brothers do not dispute being members of the Tawakal family, working within the Tawakal Group, or that Tawakal also is their name. Because each party has briefed this matter referring to the relators as "Qadir," the Court will continue to use that name in this decision.

United States and Pakistan, pursuant to the Schedule to the Independence (International Arrangements) Order of 1947, and 18 U.S.C. § 3181 *et seq.*

Pakistan has charged the Qadirs with corruption and corrupt practices (NAB Ordinance §§ 9(a)(iii), (iv), (ix), (x), (xi)).  The maximum penalty for this offense is up to fourteen (14) years and forfeiture of the proceeds from the criminal activity.  Prosecutor General Accountability ("PGA") Dr. M. Danishwar Malik asserts under oath that this offense is covered by Article III of the Treaty that includes fraud and false pretenses.[2]

## I. Procedural History

On February 13, 2008, the Government filed a sworn Complaint pursuant to 18 U.S.C. § 3184.[3]  The Complaint states that the Government of the Islamic Republic of Pakistan has

---

[2] The relevant portions of the treaty follow:

17. Fraud by a bailee, banker, agent, factor, trustee, director, member, or public officer of any company; or fraudulent conversion.
18. Obtaining money, valuable security, or goods by false pretenses; receiving any money, valuable security, or other property, knowing the same to have been stolen or unlawfully obtained.

Treaty, Art. 3.

[3] 18 U.S.C. § 3184 states in relevant part:

Whenever there is a treaty . . . for extradition between the United States and any foreign government . . . any magistrate judge authorized so to do by a court of the United States . . . may, upon complaint made under oath, charging any person found within his [or her] jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty . . . issue his [or her] warrant for the apprehension of the person so charged . . . .  If, on such hearing, he [or she] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty . . . he [or she] shall certify the same . . . to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person . . . .

18 U.S.C. § 3184.

charged the Qadirs with violating "Section 9a (Corruption and Corrupt Practices) . . . of the

National Accountability Ordinance 1999." (Compl. ¶ 4.) In support of this Complaint, the

Government submitted many documents to the Court, including:

1.   Affidavit of Mohammad Ayub Durrani ("Durrani Aff."), an investigator with the National Accountability Bureau, Government of Pakistan ("NAB");

2.   Affidavit of PGA Malik, NAB ("Malik Aff.");

3.   Certified documents supporting the extradition request submitted by the Government of Pakistan in support of the extradition request; and,

4.   Declaration from Gregory B. Wierzynski ("Wierzynski Decl."), Attorney-Advisor in the Office of the Legal Advisor for the Department of State, and the annexed copies of the Treaty and diplomatic notes affirming that the Treaty remains in full force and effect.

The United States filed a Memorandum of Law in Opposition to Bail and a

Memorandum on the Law of Extradition. (Docket Nos. 4, 6.) The Court held an initial

appearance on March 6, 2008. The Qadirs appeared without counsel, and sought a continuance

to enable them to hire an attorney. The Court scheduled the extradition hearing for April 2,

2008.

On April 2, 2008, the Qadirs appeared before the Court represented by counsel. Counsel

sought a continuance because he only recently had been retained and needed additional time to

review the documents submitted by the Government in support of extradition. The Government

did not object to this continuance. The Court continued the extradition hearing until July 2,

2008. On July 2, 2008, because a series of motions had been filed on the eve of the hearing, the

Court ordered the parties to file consolidated memoranda to ensure full, but orderly, hearing on

all matters in dispute.[4] The Court continued the extradition hearing until July 11, 2008. On July 4, 2008, the Qadirs submitted a Consolidated Memorandum of Law in Opposition to Extradition ("Qadirs' Br."). (Docket Nos. 27, 28.) The United States filed a July 8, 2008 Consolidated Response ("Govt.'s Br."). (Docket No. 29.) On July 9, 2008, the United States filed a Citation of Supplemental Authority. (Docket No. 30.)

On July 11, 2008, the parties were heard in an extradition hearing. During the hearing, counsel for the Qadirs objected to the supplemental authority from the United States as untimely filed. The Court overruled the objection, allowing eleven days for the Qadirs to respond to the cited authority. The Qadirs indicated they would not respond. The Court conducted the hearing and took the matter under advisement. The Qadirs never sought modification or redetermination of the Court's decision to keep them in custody.

## II. Conduct Alleged

The sworn Complaint requests extradition based on the conduct of several members of the Tawakal family, and their handling of a group of companies, the Tawakal Group, owned by them. The Qadirs' father, Abdul Qadir Tawakal, headed this large business conglomerate, and ran it with his sons, including Farooq and Farid, throughout Pakistan. (Compl. ¶ 6.) Specifically, the Complaint alleges that in 1994, the Tawakal Group created Naya Daur Motors, Pvt., Ltd. ("Naya Daur" or "NDML"). (*Id.*) NDML advertised broadly and solicited public

---

[4] The Qadirs had submitted two papers for each motion, one for Farooq Tawakal, and one for Farid Tawakal. Between June 23 and July 2, 2008, the Qadirs submitted memoranda of law, supplemental memoranda of law, and second supplemental memoranda of law. (Docket Nos. 15-18, 20-21.) They included in one document a reply to the Government's Response, and then filed a reply separately. (Docket Nos. 20-23.)

The Government filed a June 30 response and a July 1 response to the Qadirs' memoranda. (Docket Nos. 19, 24.)

funds to purchase Kia automobiles that they never delivered, and, after placing money in various banks, converted the proceeds to their own use. Nearly 16,120 Kia cars were fully or partially "purchased," but only approximately 1,252 cars were delivered. (Durrani Aff. ¶¶ 6, 9; Malik Aff. 3.) Refunds were issued for 672 units. (Durrani Aff. ¶ 9.) The Complaint specifies "that the monies collected as advance fees for purchase of cars were 'later secretly transferred to other bank accounts for ulterior purposes and inter alia misappropriated by Tawakal Group for their own personal gain[.]'" (Compl. ¶ 6 (*quoting* Malik Aff. 3.)) Over 13.5 million U.S. dollars were converted in this fashion, and over twice that if valued at 1995 exchange rates. (Compl. ¶ 6 at 6; Durrani Aff. 15.)

Farid Qadir Tawakal was a director of NDML in December 1993, and Farooq Tawakal was Chief Executive in January 1994. (Durrani Aff. 4.) Muhammad Abid, the cashier of NDML, described the business operation, noting that the father Abdul Qadir Tawakal was "supervising/controlling" all of the Tawakal Group companies, and describing Farooq Qadir as the "M.D." or Managing Director of NDML, and Farid Qadir (and another brother Noor) as "the Chief Executive/Directors of M/s NDML and major share holders" of that company. (Durrani Aff. 10.) Abid reported to Durrani that a "huge amount" of funds collected for the sale of cars "was misappropriated" by Farooq and Farid Qadir and other members of their family. (Durrani Aff. 11.)

Durrani and Malik describe a scheme to re-book the same cars in a fraudulent manner involving Abid and NDML accounts at Emirates Bank Karachi and the Shahrah-e-Faisal Branch, Karachi. (Durrani Aff. 9; Malik Aff. 3.)

5

Mr. Amin Bhimani, Company Secretary and General Manager (Finance) NDML, gives examples of specific transactions which the documents confirm. (R. at 868-72.) Bhimani states that the money received for the cars was transferred between July 1994 and May 1995 to three other companies, including Moon River International (Pvt.) Ltd. ("Moon River"), which is not a real company. (Durrani Aff. ¶ 5.) Of the nearly 5.4 million U.S. dollars transferred, over $2.5 million were transferred in the form of bearer checks to Farooq Qadir, who was the managing director of Moon River, and others. (R. at 868-72.) The payments were reflected as "short term loan[s]." (*Id.*) The bearer checks (whose issuance was prohibited by company rules) were distributed to others (*id.*), and no company records indicate what happened to the funds after transfer to Moon River.

It is alleged that on February 15, 1995, Farid Qadir transferred just under $160,000 (10,000,000 PKR) from the NDML account at Emirates Bank in Karachi to Shanghai Bank Karachi (The Hong Kong and Shanghai Banking Corporation Limited or "HSBC") account in his name. (Durrani Aff. ¶ 13; Malik Aff. 3; R. at 395, 1113-14, 1119, 1128.) Farid Qadir's HSBC account shows multiple cash deposits, and many withdrawals. (R. at 1119.) The balance rose to nearly twice its opening balance and, as of April 4, 1995, had a balance of only 1414 PKR. The balance rose slightly through December 1995. (R. at 1121-27.)

Investigator Durrani describes the transfer of 340 million Rupees to three entities, all of which are associated with Farooq or Farid Qadir, or both. (Durrani Aff. ¶ 11.) Durrani reviewed vouchers involving Moon River (both Qadirs were Directors), M/S Taha International Export Corporation (Pvt.), Ltd. ("Taha") (Farid Qadir, Director), and M/S Tawakal Textile (Pvt.) Ltd. ("Tawakal Textile") (Farooq Qadir, Director). (*Id.*) Durrani's review of the vouchers indicated

6

that "[n]one of the above named individuals returned Loan amount to NDML and embezzled it." (*Id.*) PGA Malik states that the "public money has not been returned," and that members of the Tawakal Group used the funds for their own gain. (Malik Aff. 3.)

Finally, Durrani examined security deposits worth 12 million rupees taken from various dealers authorized to make bookings for NDML. (Durrani Aff. ¶ 7.) This money also was "received and embezzled in the same manner." (Malik Aff. 3.)

### III. Standard of Review at Extradition Hearings

The United States Court of Appeals for the Fourth Circuit has recognized that an extradition hearing is not meant to be a "full trial." *Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir. 1976). Instead,

> The purpose [of an extradition hearing] is to inquire into the presence of probable
> cause to believe that there has been a violation of one or more of the criminal laws
> of the extraditing country, that the alleged conduct, if committed in the United
> States, would have been a violation of our criminal law, and that the extradited
> individual is the one sought by the foreign nation for trial . . . .

*Id.* Extradition is an executive function deriving from the President's power to conduct foreign affairs. *In re Extradition of Exoo*, 522 F. Supp. 2d 766, 775 (S.D.W. Va. 2007). "'[T]he judiciary serves an independent review function delegated to it by the Executive and defined by statute.'" *Id.* (*quoting Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 828 (11th Cir. 1993)). The court limits its consideration to five factors in extradition proceedings which, culled from case law, are listed below:

(1) Whether the judicial officer is authorized to conduct extradition proceedings;

(2) whether the Court has jurisdiction over the extraditee;

(3) whether the applicable treaty is in full force and effect;

7

(4) whether the crimes for which surrender was requested were covered by the treaties; and,

(5) whether probable cause exists to sustain the charge for which extradition is sought.

*See Ornelas v. Ruiz*, 161 U.S. 502, 507 (1896); *In re Exoo*, 522 F. Supp. 2d at 775.

## IV. Discussion

The Qadirs do not challenge the first two factors the Court must consider.   During the July 2 and 11, 2008 hearings, they confirmed this Court has jurisdiction to hear the dispute, and they did not contest identity, meaning that this Court has jurisdiction over them.[5]   As such, Factors One and Two are satisfied.

Instead, the Qadirs place seven issues before the Court, all of which fall under the three remaining factors this Court must consider before making any finding.  The Qadirs maintain that: (1) no extradition treaty between the United States and Pakistan exists; (2) the charges violate ex post facto law in Pakistan;[6] (3) the request for extradition under the NAB Ordinance is improper; (4) the Qadirs fear torture if extradited to Pakistan; (5) the extradition treaty bars extradition for

---

[5] 18 U.S.C. § 3184 specifically grants a magistrate judge authority to conduct extradition hearings, and provides that jurisdiction rests as to charges against any person within the court's jurisdiction.

[6]Article 12 of Pakistan's Constitution states in relevant part:

Protection against retrospective punishment: (1) No law shall authorize the punishment of a person–

(a) for an act or omission that was not punishable by law at the time of the act or omission; or

(b) for an offence by a penalty greater than, or of a kind different from, the penalty prescribed by law for that offence at the time the offence was committed.

Pakistan Const. Art. 12.

charges that violate either country's statute of limitations; (6) the charge alleged violates the ex

post facto clause of the United States Constitution; and, (7) insufficient evidence exists to

establish probable cause. The Qadirs assert that the first four arguments prohibit extradition

whether or not there is a treaty in full force and effect, and that the other three grounds defeat

probable cause. The Court shall discuss each challenge as it pertains to the factors the

Government must prove for the Court to consider whether certifications of extraditability should

issue.

A.      **Factor Three: Applicable Treaty in Full Force and Effect**

The Qadirs maintain that the Government has not established Factor Three because no

extradition treaty between the United States and Pakistan exists. The Qadirs argue that, because

the 1973 Pakistani Constitution and the India Independence Act of 1947[7] failed to adopt the

treaty specifically, and Pakistan does not qualify as a successor state to British India, the treaty

lapsed as to Pakistan.[8]

In jumping to these arguments, however, the Qadirs fail to show this Court why it should

ignore the vast amount of evidence establishing that the treaty is, indeed, in full force and effect.

First, Congress has listed this treaty with Pakistan as one of the bilateral treaties of extradition in

---

[7] Specifically, the Qadirs argue that Article 7(b) of the Indian Independence Act eviscerates application of the treaty when it provides that British sovereignty lapses "and with it, all treaties and agreements in force at the date of the passing of this Act between His Majesty and the Rulers of Indian States." The Qadirs add that Pakistan failed to specifically adopt the treaty with the lawmaking power provided under Article 6 of the Independence Order, which extends to laws with extraterritorial operation.

[8] The Qadirs claim this is so because Pakistan's borders are not contiguous to previously existing borders, and distinguish Pakistan from India in that manner. For instance, they note that India took over an extant seat in the United Nations, while a new seat had to be created for Pakistan.

effect with the United States.[9] 18 U.S.C. § 3181 (*citing* 47 Stat. 2122, noting that the treaty with

Pakistan was signed on December 22, 1931, and that it entered into force on March 9, 1942); 47

Stat. 2122, TS 849, 12 Bevans 482, 163 LNTS 59. The Court finds the current statutory

recognition of the Treaty to be highly persuasive, and the Qadirs offer no explanation why this

Court should inquire beyond it.

Second, a competent representative of the Department of State has sworn under penalty of

perjury that this treaty is in full force and effect. (Wierzynski Decl. ¶ 3.) This same official

appends Pakistan's August 29, 2007 request for extradition of the Qadirs made pursuant to the

Treaty and diplomatic notes which he says confirm the adoption of the Treaty by both countries.

(Wierzynski Decl. ¶ 2-3.) The Qadirs offer no sworn statement or judicial finding

countermanding the sworn evidence from the Department of State.

This Court must give great weight to the interpretation of treaties given by the

Department of State. *See Sayne v. Shipley*, 418 F.2d 679, 684 (5th Cir. 1969), *cert. denied*, 398

U.S. 903 (1970) ("Because we recognize that the conduct of foreign affairs is a political, not a

judicial function, such advice, while not conclusive on this Court, is entitled to great weight and

importance.") (citation omitted). Indeed, the Court must give weight to the intentions of both

countries. *See Hoxha v. Levi*, 371 F. Supp. 2d 651, 659 (E.D. Pa. 2005) ("[T]he Court must

defer to the intentions of both countries' respective state departments when deciding the

---

[9]The Qadirs point to one source, early in time, that fails to list the Treaty. This does not
alter the persuasive power of the multitude of subsequent listings.

continued validity of a treaty.").[10]  This Court finds the declarations and the letters as to the existence of the Treaty highly persuasive.

Moreover, other courts clearly recognize that Pakistan and the United States have an extradition treaty. *See, e.g., United States v. Khan*, 993 F.2d 1368, 1372 n. 1 (9th Cir. 1993) ("[T]he United States Extradition Treaty with Great Britain dated December 22, 1931, which was made applicable to India from March 9, 1942, is the operative extradition treaty between the United States and Pakistan."); *Ahmed v. Morton*, No. CV-96-0760 (CPS), 1996 WL 118543, at *3 (E.D.N.Y. Mar. 6, 1996).  Several recent cases discuss the extradition of individuals pursuant to the Treaty.[11]  *See, e.g., United States v. Khattak*, 273 F.3d 557, 559 (3d Cir. 2001) ("Khattak, a resident of Pakistan . . . . was arrested and extradited to the United States."); *United States v. Yousef*, 927 F. Supp. 673, 681 (S.D.N.Y. 1996) ("Yousef was surrendered to United States officials by the Pakistani government pursuant to an extradition request made by the United States."); *Ahmed*, 1996 WL 118543, *1-3.  Former extraditions under the Treaty provide a "clear indication" that the Treaty remains in effect.  *Hoxha*, 371 F. Supp. 2d at 659.

---

[10] In *Hoxha,* a challenge was made to the viability of an extradition treaty with Albania because Albania could not be a successor government to the Kingdom of Albania, and thereby could not be a contracting party to the treaty.  In a habeas challenge, the District Court upheld the Magistrate Judge's refusal to hear testimony from Albanian legal experts on the validity of the treaty because of the "limited nature of the judicial branch's review over this question." *Hoxha,* 371 F. Supp. 2d at 659.  Here, the Qadirs propose the Court undergo such analysis without offering expert opinion.

[11] Although the Qadirs suggest that these cases should not persuade because none of the subject extraditees in those cases challenged the existence of the Treaty, this Court finds otherwise.  The validity of the Treaty is integral to any decision to extradite.  Especially given the record at bar, this court is loathe to presume that so many other courts failed properly to assess the validity of the Treaty. Moreover, the failure to challenge the application of the Treaty in so many cases can attest to its treatment as a fact one cannot challenge because it is so obviously true.

Finally, the United States presents an aspect of the Independence Order that calls into question the Qadirs' claim that the Treaty lapsed.  The United States proffers Schedule 4 of The Indian Independence (International Arrangements) Order of 1947, which states in part:

> 4. Subject to Articles 2 and 3 of this agreement, rights and obligations under all international agreements to which India is a party immediately before the appointed day will devolve both upon the Dominion of India and upon the Dominion of Pakistan, and will, if necessary, be apportioned between the two Dominions.

The Gazette of India Extraordinary, Aug. 14, 1947, at 911-12.  This appears to confirm that the international agreements such as the one at bar remain in effect.

Given the variety of manners in which this Treaty has been recognized, and given that this Court has before it statements from competent individuals in the United States and Pakistan that the treaty exists, this Court declines the invitation to analyze Pakistani constitutional and international law to confirm whether this should be discredited.  The arguments presented by the Qadirs do not warrant such inquiry.[12]  On this record, it is well beyond the Court's purview. Accordingly, the Court finds that Factor Three is satisfied because an extradition treaty between the United States and Pakistan is in full force and effect.

1.    **Form of the Extradition Request**

In an argument presuming that the Treaty is not in full force and effect, the Qadirs next suggest that extradition cannot commence because the form of the extradition request is improper.  They contend that (because no treaty pertains) the only authority from which the

---

[12] The Qadirs offer no verified evidence otherwise.  And even turning to Pakistan's Constitution, the Court notes that Article 7 relied upon by the Qadirs pertains to agreements between Britain and the Rulers of the Indian States.

extradition request could come would be the NAB Ordinance. Citing Section 21(f)[13] of the NAB

Ordinance, the Qadirs argue that this Court cannot permit what would be an involuntary

extradition under the NAB Ordinance. Most fundamentally, this Court has found that the Treaty

is in effect, so the argument cannot stand.

This Court finds that the form of Pakistan's extradition request is proper.

**B.**     **Factor Four: Dual Criminality**

The Qadirs argue that the Government cannot establish dual criminality because the

statute of limitations in the United States has lapsed on such a standard fraud, pointing the court

to the wire or mail fraud statutes, found at 18 U.S.C. § 1341 and § 1343, respectively. Mail and

wire fraud charges must commence within five years.[14]   Article 5 of the Treaty states:

> The extradition shall not take place if, subsequently to the commission of the
> crime or offence or the institution of the penal prosecution or the conviction
> thereon, exemption from prosecution or punishment has been acquired by *lapse of
> time*, according to the laws of the High Contracting Party *applying or applied to.*

The Treaty, Art. 5 (emphases added); *see also Yapp v. Reno*, 26 F.3d 1562, 1568 (11th Cir. 1994)

("[W]e hold that the 'lapse of time' provision in Article 5 of the 1931 Extradition Treaty refers to

---

[13] Section 21(f) allows the Chair of NAB, or another authorized individual, to "transfer in
custody to Pakistan a person detained in the foreign State who *consents* to assist Pakistan in the
relevant investigation or proceedings." (Qadirs' Br. 16.) This pertains to "International
Cooperation - Request for mutual legal assistance" (NAB Ordinance 21), and not extradition to
prosecute for alleged criminal conduct,

[14] 18 U.S.C. § 3282 provides:

Except as otherwise expressly provided by law, no person shall be prosecuted,
tried, or punished for any offense, not capital, unless the indictment is found or the
information is instituted within five years next after such offense shall have been
committed.

18 U.S.C. § 3282.

the running of a statute of limitations."). The United States reports that Pakistan has no statute of limitations for criminal offenses, and the Qadirs argue lapse solely on the statute of limitations applicable in the United States.

The Government, on the other hand, suggests that the proper comparison lies with 18 U.S.C. § 1344,[15] bank fraud. Bank fraud carries with it a ten-year statute of limitations.[16]

Interpreting a treaty requires a court to construe treaty obligations "more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933). Also, courts "approach challenges to extradition with a view towards finding the offenses within the treaty." *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981). In assessing dual criminality, a court must look to see whether "the requesting and requested countries' statutes [are] substantially analogous or 'punish conduct falling within the broad scope of the same generally recognized crime.'" *Ross v. U.S. Marshal for the E. Dist. of Okla.*, 168

---

[15] 18 U.S.C. § 1344 states:

**Bank Fraud:**
Whoever knowingly executes, or attempts to execute, a scheme or artifice–
    (1) to defraud a financial institution; or
    (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

[16] 18 U.S.C. § 3293 provides in relevant part:

No person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate . . . (1) section . . . 1344 . . . unless the indictment is returned or the information filed within 10 years after the commission of the offense.

18 U.S.C. § 3293.

14

F.3d 1190, 1195 (10th Cir. 1999) (assessing same Treaty and *quoting Peters v. Egnor*, 888 F.2d 713, 718 (10th Cir. 1989)).

### 1.      Statute of Limitations:  Bank Fraud

The Qadirs allege the criminal activity with which they are charged ended in mid-1996, and so-called "red notices" were not issued until November 14, 2003 (Farooq Qadir) (R. at 48-54) and April 23, 2004 (Farid Qadir)(R. at 39-40), and perpetual non bailable warrants of arrest were not issued until July 13, 2004 (Farooq and Farid Qadir).  (Malik Aff. 2.)  Any of these dates, the Qadirs contend, would exceed the statute of limitations for wire and mail fraud. (Qadirs' Br. 22.)  The United States contends that, under the common law system in Pakistan, the "Charge Sheet," or "First Information Report" ("FIR"), filed on October 9, 1996, "before the special Court (Offences in Banks)" began the case because the charge sheet is the equivalent of a criminal information.  (Govt.'s Br. 20, *citing* Durrani Aff. ¶ 4.)

Courts have held that international documents equivalent to charging documents in the United States can toll the statute of limitations.  *See In Re Extradition of Bertrand*, No. 85-0158J-01, 1986 WL 8845, *5-6 (D.N.J. 1986)(finding that a Swiss international arrest warrant tolled the statute of limitations because it is equivalent to a federal indictment).  While this may be true, the Government's statement, without further explanation (and with the Qadirs claiming otherwise), is not enough for this Court to rest a decision on that basis.  The Court must presume, on this record, that at least seven years passed before charges were brought against the Qadirs.

Nonetheless, the Court finds that the substantially analogous crime to that charged in Pakistan is Bank Fraud.  The Qadirs' argument that this is not so because they did not defraud a financial institution speaks to only the first part of the bank fraud statute, 18 U.S.C. § 1344(1).

15

(Qadirs' Br. 21-22, *citing United States v. Orr*, 932 F.2d 330 (4th Cir. 1991).) However, bank fraud also exists when a person "obtain[s] any of the moneys, funds, credits, assets . . .under the custody or control of, a financial institution, by means of false or fraudulent pretenses." 18 U.S.C. § 1344(2). This clearly is the gravamen of the Pakistani charges against the Qadirs.

### a.   Charging Documents from Pakistan

The Government alleges that the Qadirs and others solicited public funds to purchase Kia automobiles that they never delivered, and, after placing money in various banks, converted the proceeds to their own use. The Complaint specifies "that the monies collected as advance fees for purchase of cars were 'later secretly transferred to other bank accounts for ulterior purposes and inter alia misappropriated by Tawakal Group for their own personal gain.'" (Compl. ¶ 6 at 6 (*quoting* Malik Aff. 3).) This Court finds highly persuasive that the documents sent by Pakistan refer to the charges of misconduct specifically in bank-related terms. First, PGA Malik states that, "[a]t present six cases of Financial fraud, corrupt practices and *defrauding the financial institutions are pending against all the accused of the Tawakal Group of Industries and their associates*" in Pakistani courts. (Malik Aff. 5.) (emphasis supplied). Second, Investigator Durrani states that the case was initiated "before the special Court (Offences in Banks) . . ." and discusses a series of fraudulent transactions at various banks. (Durrani Aff. ¶ 4.) Third, the FIR or charge sheet alleges that the Qadirs' father and brother "obtain[ed] crores[17] of rupees by fraudulent and deceitful means *from banks* DFIs and general public . . . ." (R. at 24 (Oct. 9, 1996 FIR)(emphasis supplied).) The FIR further states that, "[n]o money is available now in their

---

[17] Crore: "(in India) the sum of ten million, esp. of rupees; one hundred lacs." Dictionary.com Unabridged (v 1.1). Random House, Inc. 01 Aug. 2008. <Dictionary.com http://dictionary.reference.com/browse/crore>.

accounts." (*Id.*) Less persuasive, but nonetheless informative, is a January 12, 2005 article from an internet edition of DAWN, which advertises itself as Pakistan's most widely circulated English Language newspaper.[18] In the article, it is reported that the Qadirs' father, Abdul Qadir Tawakal:

> *was convicted of bank fraud* and sentenced to a total of 28 years' rigorous imprisonment and a fine of about Rs230 million. He was found guilty of fraudulently obtaining loan facilities amounting to Rs230 million from two commercial banks by opening fake letters of credit . . . .

(Govt.'s Br., Ex. 2 at 2. (http://www.dawn.com/2005/01/12/nat18.htm) (emphasis supplied).)

### b.    Conduct by the Qadirs

The Court finds that this record clearly establishes probable cause that Farooq and Farid Qadir engaged in activity that violates the NAB Ordinance at bar. As noted in the discussion of the conduct alleged, the record before the Court contains sworn statements by investigators alleging fraudulent conduct involving both Farooq and Farid Qadir individually. The sworn statements before the Court, and the documents accompanying them, sufficiently establish conduct likely violating criminal law. The sworn statements can be considered by the Court when assessing probable cause. The allegations outlined in Section II above alone could establish probable cause.

---

[18] The Government also asks this Court to consider statements and information about the nature of charges from Pakistan in each of the Qadirs' presentence reports prepared in criminal cases pursued in the Eastern District of Virginia. While that information may be relevant, this Court will not rely upon those sensitive documents absent their being placed in this separate court record upon proper motion. While the parties are the same, release of that information usually requires a district court order. In any event, the Court can make a determination absent the information.

The Court also finds that the records support the allegations made. The documents show the existence of a large corporate entity headed by the Qadirs' father. The documents also show, and they do not deny, their active participation in aspects of that corporate entity. The Qadirs have written to the Court indicating that their father is imprisoned in Pakistan, and the record suggests it is for the same sort of fraudulent conduct charged against the Qadirs. As described below, the record establishes conduct by each brother as questionable financial transactions involving banking institutions.

Specifically, as discussed above, the sworn statements indicate that Farid Qadir was a director of NDML in late 1993, and Farooq Qadir was Chief Executive and Director in January 1994. The records confirm the investigator's sworn allegations. (R. at 231). Abid, the cashier of NDML, described Farooq Qadir as the Managing Director of NDML, and Farid Qadir as a Chief Executive/Director and major shareholder of NDML. (R. at 861.) Abid reported to Durrani that a "huge amount" of funds collected for the sale of cars "was misappropriated" by Farooq and Farid Qadir and other members of their family. (R. at 862.) Records from dealers documenting losses abound in the record. (R. at 275-312.)

Bhimini, general manager/finance of NDML, states that 340M PKR funds were transferred to other Tawakal family businesses, including the fictitious entity Moon River International. (R. at 868-72.) Farooq Qadir, as managing director of Moon River, signed these checks with Bhimini. (*Id.*) Approximately 160 million PKR was transferred to Moon River via bearer checks ordered by Farooq Qadir, even though company policy did not permit such checks to issue. (*Id.*) The records reflected short term loans. (*Id.*) The loans have not been returned. (*Id.*) No company records indicate what happened to the funds after transfer to Moon River.

18

Malik states these funds were transferred to other bank accounts and misappropriated by members of the Tawakal Group for their personal gain.

As to Farid Qadir, a February 15, 1995 transfer of just under $160,000 from the Naya Daur bank accounts at Emirates Bank in Karachi is alleged to have been transferred to the HSBC account Farid Qadir opened in his own name, apparently as a personal account. Farid Qadir's HSBC account shows multiple cash deposits, and many withdrawals. (R. at 1119.) As of April 4, 1995, the account had a balance of only 1414 PKR, and the account shows large cash deposits and withdrawals. (R. at 1119-27.)

Durrani and Malik describe a scheme to re-book the same cars in a fraudulent manner involving Abid and NDML accounts at Emirates Bank Karachi and the Shahrah-e-Faisal Branch, Karachi. Durrani describes the transfer of 340 million Rupees to Moon River, Taha, and Tawakal Textile, all of which are associated with Farooq or Farid Qadir, or both. Both Durrani and Malik note that no loans were returned. Muhammad Lakhani, an employee of Abdul Qadir Tawakal, similarly describes moneys improperly transferred and loans unpaid, and implicates the Qadirs along with others in their family. (R. at 995-96.)

Durrani alleges that he examined security deposits worth 12 million rupees taken from various dealers authorized to make bookings for NDML. (Durrani Aff. ¶ 7.) Malik states that this money also was "received and embezzled in the same manner." (Malik Aff. 3.) An affidavit of Abu Bakar describes this booking arrangement, via which several checks bounced. (Bakar Aff.; R. at 729-30.)

Finally, a September 14, 2000 letter to Pakistan's Securities and Exchange Commission in the record from a former director of NDML, Ali Asghar, seeks certified copies of records as to

his tenure. (R. at 187.)   While denying that any such loans occurred, Asghar writes that he "had been on the board of the said company for some time as a result of which I am *facing litigation from banks due to non-payment of their loans*." (*Id.*) (emphasis supplied.)   This type of loss is precisely what the sworn statements allege occurred.

### c.   Other Analogous Statutes

The Qadirs suggest that bank fraud cannot be analogous because the NAB Ordinance does not specifically mention bank fraud, and because it emphasizes taking of public money,[19] not money from banks.   However, this ignores that "'[t]he bank need not be the immediate victim of the fraudulent scheme' . . . and the victim bank need not have suffered an actual loss; it is sufficient for the government to show 'that a financial institution [was] exposed to an actual or potential risk of loss.'" *United States v. Brandon*, 298 F.3d 307, 312 (4th Cir. 2002) (discussing § 1344(1)) (quotations omitted); *see United States v. Royston*, 184 F. Supp. 2d 517, 520-21 (W.D. Va. 2002) (recognizing conflicting law but finding that risk of loss likely required under § 1344(2)).   The FIR specifically charges that no money is available in the accounts, suggesting at least a potential loss on the part of the banks. (R. at 24 (Oct. 9, 1996 FIR).)   Any transaction with Moon River International involved a non-existent company, and therefore potential loss. The DAWN report of the father's conviction for bank fraud and for opening fake lines of credit likewise implicates loss to a bank.   Finally, the letter from former NDML Director Asghar

---

[19] The Qadirs contend that the NAB Ordinance, enacted in 1999, created a new offense of corruption that did not exist in the Pakistan Penal Code of 1860.   However, throughout these proceedings the parties have argued in terms of fraudulent conduct, which the Pakistani Penal Code of 1860 addressed.   In any event, as discussed below, the Court finds the most analogous crime to be that of bank fraud, which does not constitute a new crime as argued by the Qadirs.

specifically says he is being sued by financial institutions for non-payment of loans. This demonstrates actual loss.

The Qadirs' argument also sidesteps the standard of comparison courts employ when evaluating dual criminality. For instance, the offense in the foreign country need not have the same name, nor be coextensive with, a counterpart in the United States. *Collins v. Loisel*, 259 U.S. 309, 312 (1922) (Brandeis, J.) "It is enough if the particular act charged is criminal in both jurisdictions." *Id.*; *United States v. Sensi*, 879 F.2d 888, 894 (D.C. Cir. 1989)(*citing Collins, id.*); *Messina v. United States*, 728 F.2d 77, 79 (2d Cir. 1984) (*citing Collins, id.*). Clearly, the acts the Qadirs are charged with committing encapsulate the essence of bank fraud in the United States, and are substantially analogous to that charge.

Thus, the Qadirs' claim that an analogy better lies with standard fraud, such as mail or wire fraud, is to no avail. First, the record contains multiple references explicitly calling the conduct bank fraud. Second, the record before the court recounts numerous fraudulent transactions involving banks, but is less specific as to the use of mail or interstate wires. Third, any mail fraud would affect a "financial institution" and therefore be subject to a ten-year statute of limitations. 18 U.S.C. § 3293(2). Fourth, reference to the taking of public money creates no greater inference that mail or wire fraud occurred rather than bank fraud. Nor does it preclude the existence of bank fraud. Finally, given the flexible standard requiring a "view towards finding the offenses within the treaty," even if wire or straightforward mail fraud also were implicated (each of which this Court finds less analogous), the Court likely should certify extradition because at least the bank fraud charge warrants such a finding. *McElvy*, 523 F. Supp. at 48. For instance, United States courts have held that a statute in a foreign country does not

21

require use of the mails to establish fraud; mail fraud can still be considered an analogous crime so long as the substantive conduct is functionally identical. *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450 (9th Cir. 1987); *United States v. Marconi*, 899 F. Supp. 458, 462 (C.D. Cal. 1995).

The conduct alleged clearly is most analogous to bank fraud. The statutes before the Court are substantially analogous, punishing "'conduct falling within the broad scope of the same generally recognized crime.'" *Ross*, 168 F.3d at 1195. The evidence presented by the Government to the Court clearly compares to charges of bank fraud under 18 U.S.C. § 1344.

The ten-year statute of limitations has not been exceeded, and the Government has established Factor Four.

## 2.    Tolling of the Statute of Limitations

Under the premise that a five-year statute of limitations might apply, the parties addressed the tolling of the statute; such tolling might commence when any person is "fleeing from justice." 18 U.S.C. § 3290.   The Government contends that the Qadirs fled Pakistan to avoid prosecution, and the Qadirs contend otherwise. Because the Court finds a ten-year period applicable, the Court need not address these arguments.

## C.    Factor Five: Competent Legal Evidence

### 1.    Ex Post Facto

The Qadirs claim that no competent legal evidence exists to show that the crime was committed because Section 9 of the NAB Ordinance violates the Ex Post Facto clause of

Pakistan's Constitution.[20]   The Qadirs also argue that the Ordinance violates the Ex Post Facto

Clause of the United States Constitution, an analysis this Court will not undertake because it

would not be proper to do so.[21]   No dispute exists that Section 9 of the NAB Ordinance increased

the maximum penalty for the crime charged from nine to 14 years imprisonment, and did so in

1999, after the 1995-96 conduct charged against the Qadirs.

The Qadirs offer no explanation as to why this Court should engage in an analysis of

Pakistani constitutional or statutory law as part of this proceeding.   Essentially, they challenge

the manner in which the NAB Ordinance retrospectively relates back to January 1, 1985,[22]

thereby making illegal their 1995-96 conduct.   Their arguments rest on application of Pakistan's

Constitution, among other provisions.   The Qadirs can raise this issue before a Pakistani court,

---

[20] Article 12(1) of the 1973 Constitution provides that: "No law shall authorize the punishment of a person . . . (b) for an offence by a penalty greater than . . . the penalty prescribed by law for that offence at the time the offence was committed."

[21] The Qadirs argue that Article 4(1) of the 1973 Constitution provides protection under the Ex Post Facto clause of the United States Constitution when it states that it is the inalienable right of every citizen of Pakistan "[t]o enjoy the protection of law and to be treated in accordance with the law . . . wherever he may be."
The Court sees nothing in the Treaty at issue that purports to permit application of all laws of another country to the extradition process.   Indeed, the Treaty on its face presumes otherwise when it speaks only of statute of limitations issues as to either High Contracting Party and does not include both High Contracting Parties in other clauses.   *See* Treaty, Article 5.   The Court finds that applying an American Constitutional analysis to the NAB Ordinance would be improper.   *See Neely v. Henkel,* 180 U.S. 109, 122-23 (1901); *In re Extradition of Artukovic,* 628 F. Supp. 1370, 1377 (C.D. Cal. 1986) ("That respondent could not be prosecuted under such an ex post facto law in *this* country is not significant in this proceeding: due process cannot be extended territorially.").

[22] Section 2 of the NAB Ordinance provides: "This Ordinance shall come into force at once and shall be deemed to have come into force from the 1st day of January 1985." Section 3 states: "The provisions of this Ordinance shall have effect notwithstanding anything contained in any other law for the time being in force."

whose expertise can better address such arguments. *See In re Extradition of Rabelbauer*, 638 F. Supp. 1085, 1089 (S.D.N.Y. 1986) ("As a policy matter, the extraditing court should be reluctant to engage in consideration of a defense which is purely a creature of [the requesting country's] law and in no way related to treaty interpretation."). Solely relying on aspects of Pakistan's law, the Qadirs cite nothing relevant in the *Treaty* before the Court that bolsters their ex post facto argument. This Court's refusal to hear such arguments does not bar them altogether. A Court in Pakistan should decide such issues, and this Court is bound by "the existence of an extradition treaty to assume that the trial will be fair."[23] *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911).

Other courts have clearly noted that ex post facto prohibitions do not preclude a finding of probable cause. *See In re Extradition of Kuri*, No. 04-6049M-DKD, 2006 WL 1663536, at *5 (D. Ariz. June 14, 2006) ("Respondent attacks this arrest warrant on [the weight of the evidence] and also asserts an ex post facto defense which does not completely obliterate probable cause."); *In re Artukovic*, 628 F. Supp. at 1377 ("[I]t is not an obstacle in this [extradition] proceeding, although it may be in [the requesting country], that [the statute] may be an *ex post facto* law as to the crimes charged against respondent.").

The Court finds that the ex post facto arguments raised by the Qadirs do not sufficiently challenge the competency of the evidence before the Court because they exceed the bounds of issues that properly can be contemplated during an extradition hearing.

---

[23] While not asking this Court to opine as to the issue, the Government attempts to confirm that extradition will not be unfair by relying on the law of Pakistan to suggest that Pakistani courts might reject the Qadirs' ex post facto argument. *See Khan Asfandyar Wali v. Fed'n of Pakistan*, PLD 2001 Supreme Court 607, 895. The Qadirs have cited no Pakistani judicial decisions otherwise, but the Court nonetheless declines to engage in the analysis.

## 2.    Sufficiency of the Evidence

The Qadirs maintain that the evidence is insufficient to support probable cause because the record lacks evidence that the Qadirs were directors, or otherwise had decision-making authority, of Naya Daur Motors Ltd. during the relevant time.  They also allege insufficient evidence of conduct exists to tie them personally.  The Court disagrees.

First, Pakistani law criminalizes conduct of "Associates."[24]  The Qadirs do not deny being employed within the relevant Tawakal Group entities.  The record reflects that the Qadirs played significant roles in the company at various times, and that their family controlled all aspects of the business.  The evidence also suggests that they benefitted from the alleged fraudulent scheme because the proceeds of the scheme were transferred into bank accounts controlled or used by the Qadirs.  The Qadirs' father has been convicted of similar fraudulent conduct.  Thus, even if the

---

[24] *See, e.g.,* National Accountability Ordinance, § 5, cl. d, which states in relevant part:

(d)    "Associates" means . . . .

    (i)    any individual who . . . has been managing the affairs . . . of the accused or who enjoys or has enjoyed any benefit from the assets . . . .

    (ii)    any association of persons, body of individuals, partnership firms or private limited companies . . . of which such a person is or has been a member . . . .

    . . . .

    (iv)    any person who ostensibly holds or is in possession or custody of any property of an accused on his behalf for the benefit and enjoyment of the accused.

*See* NAB Ordinance, http://pakistani.org/pakistan/legislation/1999/NABOrdinance.html; Malik Aff. 4-5.

evidence lacks signatures by these Qadirs on specific instruments, sufficient evidence nonetheless links the Qadirs to the charges of fraudulent conduct.

Second, the Qadirs claim they were not Directors in the relevant time period, and that only Directors could receive loans under corporate rules. Such an argument does not prevail. Corporate bylaws will not rein in an individual willing to violate criminal statutes. More importantly, the Qadirs' conduct discussed in Section 2(B)(1)(b) shows that the Qadirs improperly handled funds contrary to the NAB Ordinance. The fact that a former director seeks refuge from suits filed by banks seeking payment on defaulted loans confirms the many statements in the record that such conduct occurred. In the extradition context, probable cause exists when the evidence supports a reasonable belief that the person whose extradition is sought is guilty of the crime charged. *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993). The findings discussed above, and the record supporting them, provide ample support for a finding that probable cause exists for the charge under which Pakistan seeks extradition.

Factor Five is established because the Court finds that probable cause exists.

## D.    <u>Torture</u>

Finally, the Court addresses the Qadirs' argument that extradition should not be certified because they fear torture if they are extradited to Pakistan. The Qadirs base these arguments on several reports, including two by the United States Department of State,[25] which discuss police and security forces in Pakistan engaging in torture or corrupt practices. As to the Qadirs

---

[25] Country Reports on Human Rights Practices 2007, Pakistan at Sec. 1(c) ¶1 (Dept. of State Mar. 11, 2008) (available at http:www.state.gov/g/drl/rls/hrrpt/2007/100619.htm); Country Reports on Human Rights Practices 2006, Pakistan at Sec. 1(c) ¶1 (Dept. of State Mar. 6, 2007) (available at http:www.state.gov/g/drl/rls/hrrpt/2006/78874.htm).

themselves, they state that "there also are questions about the political implications, under the current regime, of the privatization of the Pakistan Automobile Corp. Ltd., which became Naya Daur Motors Ltd." (Qadirs' Br. at 20.) During oral argument, the Qadirs confirmed that the heart of their argument stemmed from Pakistan's practices generally, rather than from threats specific to them.

Given its limited role at this stage, the Court cannot consider this argument as a basis for denying certification. The so-called rule of judicial non-inquiry leaves political determinations to the Secretary of State: "It is the duty of the judicial branch to ensure that the individual sought is subject to extradition, while it is the duty of the executive branch, which possesses great power in the realm of foreign affairs, to ensure that extradition is not sought for political reasons and that no individual will be subject to torture if extradited." *Hoxha*, 371 F. Supp. 2d at 660 (*citing In re Extradition of Singh*, 123 F.R.D. 127, 133 (D.N.J. 1987); *Peroff*, 542 F.2d at 1249. Article 6 of the Treaty at bar prohibits extradition when the offense for which a person is sought is "of a political character." (Treaty, Art. 6.) While noting exceptions for circumstances not present here, the Fourth Circuit has recently confirmed that such political decisions are generally left to the Secretary of State. *Ordinola v. Hackman*, 478 F.3d 588, 604 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007).[26]

---

[26] The Fourth Circuit has noted that, once the executive has determined that extradition should commence, judicial inquiry into a claim of torture may be available in limited circumstances. *Mironescu v. Costner*, 480 F.3d 664 (4th Cir. 2007), *cert. dismissed*, 128 S. Ct. 976 (2008). In *Mironescu*, the court found that the Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277 (Codified at 8 U.S.C. § 1231) ("FARR Act"), which implemented the Convention Against Torture in the United States, might allow a court to determine whether extradition would violate a federal statute. 480 F.3d at 670-71. The *Mironescu* court found, however, that the statutory language in FARR allowed such analysis only upon review of a final removal order during an immigration proceeding, not during a challenge to extradition. *Id.* at

27

The rule of non-inquiry does not prevent the Qadirs from presenting such evidence altogether; it merely delays presentation to a branch of government with an "ability to speak with one voice" as to foreign policy and a branch better able to "consider sensitive foreign policy issues." *Munaf v. Geren*, 128 S. Ct. 2207, 2226 (2008) (declining to address claims in habeas petition by American citizens who are transferred from multinational forces in Iraq to Iraqi authorities for criminal prosecution could result in torture). Courts have noted that "[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States . . . judge concerning the fairness of its laws and the manner in which they are enforced." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990).

Department of State regulations make clear that the United States will not extradite a fugitive to a country where it believes it is more likely than not that the fugitive will be tortured. *See* 22 C.F.R. 95.2. The fact that the Qadirs rely on State Department studies for their claim highlights where the expertise on this issue lies, and provides an even greater reason to leave that examination to the branch that has developed such expertise. The studies also confirm that the State Department is not "oblivious" to the concerns raised by the Qadirs. *Munaf*, 128 S. Ct. at 2226 (*quoting* appellate decision, *Omar v. Harvey*, 479 F.3d 1, 20 n.6 (D.C. Cir 2007)). This Court should defer because the "other branches possess significant diplomatic tools and leverage the judiciary lacks." *Id.*

---

674; 8 U.S.C. § 2242(d).

    That decision does not change this Court's analysis. The Secretary has made no final determination, so the rule of non-inquiry properly governs this extradition proceeding. Moreover, the Qadirs do not challenge a final order of removal, meaning this Court lacks jurisdiction to review the claim. 8 U.S.C. § 2242(d).

Because the Court lacks jurisdiction to consider these claims in this extradition proceeding, so they will not be heard.

### V. Conclusion and Certifications

For these reasons, the Court finds that the Government has established all the factors needed for the Court to issue certifications of extraditability. The Court will issue an Order to submit certified copies of this Memorandum Opinion, the attached Certifications A and B, and the documents received by this Court from the Islamic Republic of Pakistan, all of which shall constitute a "copy of testimony taken" because no live testimony was heard.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: August 22, 2008

29

## CERTIFICATION A
## AS TO MUHAMMAD FARID TAWAKAL ("FARID QADIR")


The United States District Court for the Eastern District of Virginia, by the undersigned United States Magistrate Judge, hereby certifies to the Secretary of State that:

(a) With respect to Muhammad Farid Tawakal ("Farid Qadir"), a fugitive from the Islamic Republic of Pakistan who was found in this judicial district, the United States Government, acting on behalf of the Government of the Islamic Republic of Pakistan, has provided "evidence sufficient to sustain the charge" against Farid Qadir "under the provisions of the proper treaty or convention . . . ." as required by 18 U.S.C. § 3184.

(b) All applicable requirements of Chapter 209 of Title 18 of the United States Code for the extradition of Tawakal to the Islamic Republic of Pakistan have been met.

(c) The transcripts and copies of records from the Islamic Republic of Pakistan that accompany this certification constitute "a copy of all the testimony taken" in this matter as provided for in 18 U.S.C. § 3184.

_____/s/_____
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
August 22, 2008

**CERTIFICATION B**
**AS TO MUHAMMAD FAROOQ TAWAKAL ("FAROOQ QADIR")**


The United States District Court for the Eastern District of Virginia, by the undersigned United States Magistrate Judge, hereby certifies to the Secretary of State that:

(a) With respect to Muhammad Farooq Tawakal ("Farooq Qadir"), a fugitive from the Islamic Republic of Pakistan who was found in this judicial district, the United States Government, acting on behalf of the Government of the Islamic Republic of Pakistan, has provided "evidence sufficient to sustain the charge" against Farooq Qadir "under the provisions of the proper treaty or convention . . . ." as required by 18 U.S.C. § 3184.

(b) All applicable requirements of Chapter 209 of Title 18 of the United States Code for the extradition of Tawakal to the Islamic Republic of Pakistan have been met.

(c) The transcripts and copies of records from the Islamic Republic of Pakistan that accompany this certification constitute "a copy of all the testimony taken" in this matter as provided for in 18 U.S.C. § 3184.

_____/s/_____

M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
August 22, 2008